[No. 2. Decided February 28, 1890.]

## AH LIM v. THE TERRITORY OF WASHINGTON.

CONSTITUTIONAL LAW — OPIUM SMOKING.

Code Wash. T., § 2073, as amended by acts 1883, p. 30, providing that " any person or persons who shall smoke or inhale opium, . . . shall be deemed guilty of a misdemeanor," is not unconstitutional on the ground that it involves a deprivation of liberty and property without due process of law. (SCOTT and STILES, JJ., dissent.)

*Appeal from District Court, King County.*

The facts are stated in the opinion.

*Humes & Andrews*, for appellant.

The smoking and inhaling of opium is a vice, and the validity of all laws having for their object the restraint of such vice, must be construed by the same rules of construction as laws having for their objects the restraint and regulation of other vices.

It cannot be made a legal wrong for one to become intoxicated in the privacy of his room. Tiedeman on Limitation of Police Powers, § 68. The right of every man to do what he will with his own, not interfering with the reciprocal rights of others, is accepted among the fundamentals of our law. Cooley, Const. Lim. § 385; Tiedeman, Police Powers, § 68.

The inalienable right to "liberty and pursuit of happiness" is violated when a man is prohibited from doing what does not involve a trespass on others. Tiedeman, Police Powers, p. 152. That the vice of smoking opium is grossly immoral is no argument in favor of the validity of this statute. The police power of the state cannot be brought into operation for the purpose of exacting obedience to the rules of morality, and banishing vice and sin from the world. The municipal law has only to do with trespasses. It can not be called into play in order to save

one from the evil consequences of his own vices; for a violation of a right by the action of another must exist or be threatened in order to justify interference by law. Tiedeman, Police Powers, pp. 150, 151, 302; 1 Blackstone, pp. 123–4.

The territorial legislature had only such power as the organic act gave it. That power extended to "all rightful subjects of legislation." "That which the words 'rightful subjects of legislation' stood for in the minds of the people at the time they were speaking them, is the meaning that belongs to them in this statute and is the meaning we must regard. To find it out we have recourse to the most solemn and authoritative utterances current among the people, namely: Their written constitutions, statutes and adjudications." *Maynard v. Valentine*, 2 Wash. T. 14.

No state in the Union at the time of the passage of the organic act had upon its statute books a statute making a self-regarding act or vice a crime, such as drunkenness and the like, unless such drunkenness or other vice was thrust upon the attention of the public. No such power was given by the constitutions of any of the states to their respective legislatures, but they guaranteed to all the "right to life, liberty and the pursuit of happiness."

*Stratton & Fenton* and *J. T. Ronald*, for The Territory.

No special constitutional limitation or inhibition is pointed out with which the law in question is in conflict, and counsel seem to rest their case upon the broad ground that the "right to liberty and the pursuit of happiness" is violated by the prohibition of any act which does not involve direct and immediate injury to another; a reference to some of the subjects of penal legislation, the validity of which has never been questioned, or, if questioned, has been sustained by the court, may serve to test the soundness, or at least universality of counsel's "fundamental principle."

See *Commonwealth v. Kneeland*, 20 Pick. 206; *People v.*

*Ruggles*, 5 Am. Dec. 225; *State v. Baltimore, etc., R. R. Co.*, 15 W. Va. 362 (S. C. 36 Am. Rep. 803, 814.)

"The question whether a statute is a valid exercise of the legislative power is to be determined solely by reference to constitutional restraints; it may not be declared void because deemed to be opposed to natural justice and equity." *Bertholf v. O'Reilly*, 74 N. Y. 509. See *Davis v. State*, 3 Lea (Tenn.), 378; *People v. West*, 106 N. Y. 297; *Thorpe v. R. & B. R. R. Co.*, 27 Vt. 140; *Commonwealth v. Alger*, 7 Cush. 84.

The opinion of the court was delivered by

DUNBAR, J. — The defendant was indicted at the August term of the district court for King county, for the crime of smoking opium, as follows, to wit (omitting the formal part of the indictment): " The said Ah Lim, on the 27th day of September, A. D. 1889, in the county of King, in the district aforesaid, then and there being, did then and there willfully and unlawfully smoke opium, by then and there burning said opium and inhaling the fumes thereof through an instrument commonly known as an opium pipe, contrary to the form of the statute," etc.

To this indictment the defendant interposed a demurrer specifying several grounds, but the one relied upon by the defendant, and the one to be considered here, is, that the statute upon which the indictment is based is unconstitutional as being in violation of the inalienable right to life, liberty and pursuit of happiness; and that it involves a deprivation of liberty and property, through a limitation upon the means and ways of enjoyment, without due process of law.

The duty of passing upon the constitutionality of a law should be approached by the court with the utmost caution, and demands the most solemn, thoughtful and painstaking consideration. And in view of the consequences to society from the annulling of laws made by the represen-

tatives of the people, and presumed to have been enacted
in response to the express desire of the people, it becomes
the gravest question with which courts have to deal; and
we believe it has been the uniform conviction of the courts
that they ought not, and cannot in justice to a co-ordinate
department of the state government, declare a law to be
void without a strong and earnest conviction, divested of
all reasonable doubt, of its validity.

The following quotation from an opinion rendered by
Chief Justice MARSHALL in the case of *Fletcher v. Peck,* 6
Cranch, 87, commends itself to our approbation as resting
upon sound principles of propriety and right.    Said the
judge:    " The question whether a law be void for its re-
pugnancy to the constitution, is, at all times, a question of
much delicacy, which ought seldom, if ever, to be decided
in the affirmative in a doubtful case.    The court, when im-
pelled by duty to render such a judgment, would be un-
worthy of its station could it be unmindful of the solemn
obligations which that station imposes.    But it is not on
slight implication and vague conjecture that the legislature
is to be pronounced to have transcended its powers, and
its acts to be considered as void."

The organic act extends the power of the territorial
legislature to all rightful subjects of legislation, and when
once we concede the rightfulness of the subject, the extent
and character of the legislation on that subject cannot be
called in question by the courts; it has a right to take a
comprehensive view in determining the necessity of the
law, and the character of the purpose to be accomplished
by it.    This is the especial function of the legislature, and,
in the investigation of legislative power, courts have noth-
ing to do with questions of policy or expediency, for as a
learned author says:    " The constitution has created the
legislative and the judicial departments; the one to make
law, the other to construe and administer it.    It may be
mischievous in its effects, burdensome upon the people,

conflict with our conceptions of natural right, abstract jus-
tice, or pure morality, and of doubtful propriety in numer-
ous respects, and yet we would not be justified to hold that
it was not within the scope of legislative authority for such
reason; and, as has been well said by Mr. Cooley in his
work on Constitutional Limitations: 'It must be evident
to any one that the power to declare a legislative enact-
ment void, is one which the judge, conscious of the fallibil-
ity of human judgment, will shrink from exercising, in any
case where he can conscientiously and with due regard to
duty and official oath, decline the responsibility.' The leg-
islative and judicial are co-ordinate departments of the
government, of equal dignity; each alike is supreme in
the exercise of its proper functions, and cannot directly or
indirectly, while acting within the limits of its authority,
be subjected to the control or supervision of the other,
without an unwarrantable assumption by that other of
power which, by the constitution, is not conferred upon it."

Of course we do not pretend to argue that it is a respon-
sibility which can at all times be obviated or avoided; but
we insist that it must always be done with great caution and
circumspection.    Indeed, so weighty have the courts felt
this responsibility, that many courts have adopted a rule that
they will not decide a legislative act to be unconstitutional
by a majority of a bare quorum of the judges only.    Many
courts have held that before a law can be pronounced un-
constitutional some particular prohibition must be pointed
out.    In the case of *Bertholf v. O'Reilly*, 74 N. Y. 511,
Justice ANDREWS in rendering the opinion of the court
says: "The question whether the act under consideration
is a valid exercise of legislative power is to be determined
solely by reference to constitutional   .   .   .   prohi-
bitions.    The legislative power has no other limitation.    If
an act can stand when brought to the test of the constitu-
tion, the question of its validity is at an end, and neither
the executive nor judicial department of the government

can refuse to recognize or enforce it. The theory that laws may be declared void when deemed to be opposed to natural justice and equity, although they do not violate any constitutional provision, has some support in the *dicta* of learned judges, but has not been approved, so far as we know, by any authoritative adjudication, and is repudiated by numerous authorities. . . . No law can be pronounced invalid for the reason simply that it violates our notions of justice, is oppressive and unfair in its operation, or because, in the opinion of some or all of the citizens of the state, it is not justified by public necessity, or designed to promote the public welfare."

The remedy for unjust or unwise legislation, not obnoxious to constitutional objections, is to be found in a change by the people of their representatives according to the methods provided by the constitution.

Again, in *People v. West*, 106 N. Y. 293 (12 N. E. Rep. 610), the court says: "The power of the legislature to define and declare public offenses is unlimited, except in so far as it is restrained by constitutional provisions and guaranties. A legislative act is presumptively valid, and whoever questions its validity must be able to point to some limitation or restriction, or to some guaranty, in the constitution of the state or the United States, which it violates, before its operation can be stayed or the court be called upon to pronounce it void. . . . The unnecessary multiplication of mere statutory offenses is undoubtedly an evil, and the general interests are best promoted by allowing the largest practicable liberty of individual action; but nevertheless the justice and wisdom of penal legislation, and its extent, within constitutional limits, is a matter resting in the judgment of the legislative branch of the government, with which courts cannot interfere."

Whether or not the main current of decisions flows in the exact direction taken by the court in the New York

cases, we are satisfied that the doctrine is well established, that the power of the legislature cannot be restrained by the courts upon considerations of policy or supposed natural equity. Were this power given to the courts, the law, instead of being administered and decided upon uniform principles, would be decided according to the particular bent or inclination of mind of the ruling judge. What would appeal to one judge as natural equity would not be so received by another, and the different views of what constitutes a natural equity would only be equaled in number by the number of judges on the bench, each judge following his own ideas of abstract right, not limited to any well-defined path of investigation, but controlled and impelled only by his personal ideas of what ought or ought not to be allowed in a particular case; pointed in no definite direction, but drifting aimlessly like mariners at sea under a clouded sky with neither compass nor log.

"Of late years it has been much the fashion," says Judge Bell, in *Commonwealth v. McWilliams*, 11 Pa. St. 61, 70, "to impeach the action of the legislature as unconstitutional when it happens not to accord with the party's notion of abstract right." But, says the court in *Davis v. State*, 3 Lea, 376, "whether a statute is 'contrary to the genius of a free people' is a question for the legislature, not the judge; it cannot be annulled upon supposed natural equity, the inherent rights of freemen, or any general and vague interpretation of a provision of the constitution beyond its plain and obvious import." The judiciary could not set aside a law free from conflict with the constitution because it seemed unjust. It could only interfere by overstepping the limits of its sphere, by appropriating to itself a power beyond its province, and by setting an example which other organs of the government might not be slow to follow. It is its peculiar duty to keep the first lines of the constitution clear; and not to stretch its power in order to correct legislative or executive abuses. Every

branch of the government, the judicial included, does injustice for which there is no remedy, because everything human is imperfect.

The legislative power "may be unwisely exercised or abused, yet it is a power entrusted by the constitution to the legislature, which, while exercised within the scope of the grant, is subject alone to their discretion; with which the judicial tribunals have no right to interfere because, in their judgment, the action of the legislature is contrary to the principles of natural justice." *Williams v. Cammack,* 27 Miss. 209.

In the case at bar no special constitutional limitation or inhibition is pointed out with which the law in question is in conflict, but it is contended by the defense that the right of liberty and pursuit of happiness is violated by the prohibition of any act which does not involve direct and immediate injury to another.

Counsel for appellant says in his brief that the parent may be compelled to send the child to school so many months in the year; the state may prescribe his studies and may tax the people to the verge of bankruptcy to mould the infant's mind to its liking; but this right, he urges, is on the ground that the child is the ward of the state, and that such jurisdiction ceases when it becomes of age. It is difficult to see how the question of inalienable rights can be affected by age, when the law prescribes the age at which the ward arrives at his majority, and the time at which the inalienable rights attach. Doubtless the true theory on which compulsory education is sustained is, that the state has an interest in the intellectual condition of each of its citizens, recognizing the fact that society is but an aggregation of individuals, and that the moral or intellectual plane of society is elevated or degraded in proportion to the plane occupied by its individual members, and that the education is not compelled for the benefit of the

child during its minority, or for its exclusive benefit after
its majority.

The state has an undisputed right to, and does provide
gymnasium attachments to its schools, and prescribes calis-
thenic exercises for the muscular development of school
children.    The object to be obtained is not for the exclu-
sive benefit of the child.    The state has an interest in the
health of its citizens, and has a right to see to it that its
citizens are self-supporting.    It is burdened with taxation
to build and maintain jails and penitentiaries for the safe
keeping of its criminals, and to protect its law-abiding
subjects from their ravages.    It is taxed to maintain insane
asylums for the safe-keeping and care of those who become
insane through vicious habits or otherwise.    It is compelled
to maintain hospitals for its sick, and poorhouses for the
indigent and helpless, and surely it ought to have no small
interest in, and no small control over, the moral, mental
and physical condition of its citizens.

If the state concludes that a given habit is detrimental
to either the moral, mental or physical well-being of one of
its citizens to such an extent that it is liable to become a
burthen upon society, it has an undoubted right to restrain
the citizen from the commission of that act; and fair and
equitable consideration of the rights of other citizens make
it not only its right, but its duty, to restrain him.    If a man
willfully cuts off his hand or maims himself in such a way
that he is liable to become a public charge, no one will
doubt the right of the state to punish him; and if he
smokes opium, thereby destroying his intellect and shat-
tering his nerves, it is difficult to see why a limitation of
power should be imposed upon the state in such a case.
But it is urged by the defense that a moderate use of
opium, or that the moderate use of an opium pipe, is not
deleterious, and consequently cannot be prohibited.    We
answer that this is a question of fact which can only be
inquired into by the legislature.    Smoking opium is a

recognized evil in this country.   It is a matter of general information that it is an insidious and dangerous vice, a loathsome, disgusting and degrading habit that is becoming dangerously common with the youth of the country, and that its usual concomitants are imbecility, pauperism and crime.   It has been regarded as a proper subject of legislation in every western state, and it is admitted by counsel for the defense in the argument of this case that the statute in relation to the suppression of joints kept for the purpose of smoking opium was constitutional and right.

Granted that this is a proper subject for legislative enactment and control, no limit can be placed on the legislative discretion.   It is for the legislature to place on foot the inquiry as to just in what degree the use is injurious; to collate all the information and to make all the needful and necessary calculations.   These are questions of fact with which the court cannot deal.   The constitutionality of laws is not thus to be determined.   Some criticism has been made on the fact that the statute did not declare in its title the purpose for which it was enacted.   This is not necessary for the validity of a penal statute, and does not affect the constitutionality of its provisions.   *People v. West,* 106 N. Y. 297 (12 N. E. Rep. 610).

It is common to indulge in a great deal of loose talk about natural rights and liberties, as if these were terms of well-defined and unchangeable meaning.   There is no such thing as an absolute or unqualified right or liberty guaranteed to any member of society.   Natural rights and liberties of a subject are relative expressions and have relative or changeable meanings.   What would be a right of liberty in one state of society would be an undue license in another.   The natural rights of the subject or his rightful exercise of liberty in the pursuit of happiness, depends largely upon the amount of protection which he receives from the government.   Governments in their earlier existence afforded but little pro-

tection to their subjects, consequently the subject had a right to pursue his happiness without much regard to the rights of the government. The reciprocal relations were not large—he yielded up but little and received but little. If he was strong enough to buffet successfully with the world, all well and good; if not, he must live on the charity of individuals or die neglected on the highway. But now all civilized governments make provisions for their unfortunates; and progress in this direction has been wonderful even since noted sages like Blackstone lectured upon the inalienable rights of man. Not only is the protection of individual property becoming more secure, but the vicious are restrained and controlled, and the indigent and unfortunate are maintained at the expense of the government, in comfort and decency, and the natural liberties and rights of the subject must yield up something to each one of these burthens which advancing civilization is imposing upon the state. It is not an encroachment upon the time-honored rights of the individual, but it is simply an adjustment of the relative rights and responsibilities incident to the changing condition of society.

Our conclusion is, that the law in question involves no inalienable right. It may be radical, injudicious and wrong; but, as we have before indicated, these are questions solely for legislative investigation and discretion, and as has been said by Judge Story, "Judges should regard it as their duty to interpret laws and not to wander off into speculations upon their policy."

The judgment of the court below is affirmed.

ANDERS, C. J., and HOYT, J., concur.

SCOTT, J. (*dissenting*). — I cannot agree with the decision rendered in this case. That part of the act upon which the indictment is founded, is, in my opinion, void. It is as follows: "Any person or persons who shall smoke or inhale opium   .    .    .    shall be deemed guilty

of a misdemeanor," etc. Session laws of 1883, p. 30. It is amendatory of § 2073 of chapter 149 of the code, 1881.

The chapter is entitled "Smoking and inhaling opium," and apparently was mainly intended to prohibit the keeping of resorts for the smoking of opium, and to this extent was a legitimate exercise of police powers. The purpose for which the amendment was adopted is not declared, either in the entitling or in the body of the act, and cannot easily be arrived at. The acts prohibited therein have no reference to the keeping of a resort.

The only other legislation we have found upon the subject is contained in an act approved November 6th, 1877, which amends § 13 of an act approved November 12th, 1875, entitled "An act defining nuisances and securing remedies." The chapter in the code does not refer in any way to this act. All these laws were passed by our various legislatures while we were under a territorial form of government.

The offense charged in this case cannot be held to be a nuisance, for it relates purely to the private action or conduct of the individual, and must not be confounded with those acts which directly affect the public. It is thought that the act in question is *sui generis*, that there is none other of a similar nature in force in this country, or one that has ever been sustained by the courts since we became an independent nation, although there may be an occasional instance somewhat closely allied to it.

Legislation, however, has ordinarily been confined to those cases where the act of the person directly and clearly affected the public in some manner. But here a single inhalation of opium, even by a person in the seclusion of his own house, away from the sight and without the knowledge of any other person, constitutes a criminal offense under this statute. And this regardless of the actual effect of the particular act upon the individual, whether beneficial or injurious.

It is urged that there could be no conviction in such a case for the want of proof. But the difficulty or impossibility of conviction could not affect the criminality of the act. Also the evidence might sometimes be furnished by the admission, or confession of the guilty party, if in no other way. It is admitted that this law can only be sustained upon some one or more of the following grounds, viz. : That smoking or inhaling opium injures the health of the individual, and in this way weakens the state. That it tends to the increase of pauperism. That it destroys the moral sentiment and leads to the commission of crime. In other words, that it has an injurious effect upon the individual, and, consequently, results indirectly in an injury to the community. And it is claimed that we must presume that the legislature had some one or more of these objects in view in enacting the law, although there is nothing upon the face of the act to indicate the legislative intention. This is going to a very great and dangerous extent to sustain legislation, in this most important branch of our social structure.

In the case of the *People v. West*, 106 N. Y. 293 (12 N. E. Rep. 610), in rendering its opinion, the court said: "It is not necessary to the validity of a penal statute that the legislature should declare on the face of the statute the policy or purpose for which it was enacted." The statement was apparently not necessary in the decision of that case, and it is a noticeable fact, in this connection, that, in all the cases cited, the purposes of the acts were declared either in the entitling or in the body thereof, and were placed upon some one of the grounds mentioned, as affecting the health or safety of the public. The act in question, in *People v. West*, was entitled "An act to prevent deception in the sale of dairy products, and to preserve the public health."

In the case of *Bertholf v. O'Reilly*, 74 N. Y. 509, which involved the validity of an act making the owner of real

estate whereon he permitted intoxicating liquors to be sold, liable for damages in injuries resulting to individuals drinking it, the act declared its purpose to be "the suppression of intemperance, pauperism and crime."

In the Slaughter House Cases, 16 Wall. 36, involving an act granting to a corporation the exclusive right to maintain slaughter houses within the limits of a certain prescribed district, and prohibiting all other persons from building, keeping or having such houses therein, the act was entitled "An act to protect the public health."

There may be no good reason for requiring the purpose of the law to be stated upon its face in those cases wherein the injurious effect of the act prohibited thereby is demonstrated by the act itself, like the cutting off of the hand. But there is a substantial difference between such a case and those cases wherein the result of the act, as to its being harmful, is doubtful or not apparent, and perhaps occasionally having an opposite effect in the same or different individuals. In such cases, at least, the object or purpose should be expressed.

In all the cases above cited, the prohibited act directly affected and concerned the public, not simply through any primary effect upon the particular person, and therefore they do not apply with much force to the present case. Section 1924 of the organic act would seem to require that the object of the law should have been more fully expressed in the title, although it may be doubtful as to whether it is within the reason there given. The object must have been to serve some public purpose in one of the ways mentioned, if it is valid, not merely to prevent the smoking of opium. That was only the means by which the final end or object was to be attained. See *Harland v. Territory*, 3 Wash. T. 131, 145 (13 Pac. Rep. 453).

There is no good reason why the legislature should not fairly declare the object or purpose of all such laws, limiting the personal conduct of the citizen, at least, where the

direct or primary effect is upon himself only, and there are
many good reasons why it should be required.

Unless the legislature has, as it is claimed it does have,
the absolute uncontrolled right to determine that the effect
of any personal act it chooses to prohibit is injurious to
the particular citizen, and this is untenable, then the au-
thority cited, stating that it is not necessary to declare the
purpose of the act upon its face (*People v. West*), is not
applicable here, as an entirely different case is presented.
Limiting the *scope* of the act to cases where injury results
would not merely be declaring its purpose, but would be so
*framing* the act as to keep within the legislative province.
For clearly where there is no resulting injury there is no
right to restrain, if laws restraining the personal conduct
can be sustained at all where the act forbidden does not
affect the public, except through injury to the particular
individual, and thereby possibly injuring the community
in some one of the ways specified.   Certainly, any idea of
carrying such laws to a great extent would be calculated
for an advanced public sentiment.

However, if the act in question declared that no man
should willfully injure himself by smoking or inhaling
opium, thereby limiting its scope to such cases where
injury resulted, there would be strong, and I think valid,
reasons for sustaining it upon some one or more of the
grounds mentioned.   Every act of the individual which
has a direct tendency to render him unfit to perform the
duties he owes to society, is a rightful subject of legisla-
tion. · The principle is a just and legal one.   A man has
no right to do that which will render himself an imbecile,
or a pauper.   Society has an interest in the promotion
and preservation of the bodily, mental and moral health of
each individual citizen.   And laws tending to such results
should be upheld in all reasonable ways.   But because it
is true that personal acts are rightful subjects of legisla-
tion to the extent where they clearly interfere with the

reciprocal rights of others, and their control is generally recognized as being within the police powers of the state, or because they may be a rightful subject of legislation to that *further* extent where they merely result in injury to the individual and thus less directly to the state, which, however, has not as yet been very generally, if at all, recognized heretofore in this nation; it cannot be that every self-regarding act of the person which the legislature may choose to prohibit upon the ground that it is injurious to the individual, and thereby to the state, must be allowed to stand unquestioned through the courts, or that the courts have no duty to perform in the premises as to determining whether the legislature has exceeded the limit of its legitimate powers under the constitution, unless a particular specific constitutional provision can be shown which has been violated.

It is the one great principle of our form of government, expressed throughout that soul-inspiring document, our national constitution, that the individual right of self-control is not to be limited, only to that extent which is necessary to promote the general welfare. And these are not only questions of natural right but of constitutional right as well. It is none the less a constitutional guaranty because general in its nature, or implied in the bill of rights, or because each particular act wherein the will of the citizen should not be interfered with is not pointedly and specifically guaranteed. Such particularity would be impossible. When one becomes a member of society he necessarily parts with some rights or privileges which, as an individual, not affected by his relations to others, he might retain.

A body politic is a social compact by which the whole people covenants with each citizen, and each citizen with the whole people, that all shall be governed by certain laws for the common good. This does not confer power upon the whole people to control rights which are purely and

exclusively private, but it does authorize the establishing of laws requiring each citizen to so conduct himself and so use his own property as not unnecessarily to injure another. This is the very essence of government. See *Munn v. State of Illinois*, 4 Otto, 113.

It is contended here that the legislature, being the sole and absolute judge of the effect upon the individual, of the act forbidden, has decided every act of smoking or inhaling opium to be injurious to the person so doing, no matter how long or how short the duration, or how great or how small the quantity, or under what conditions or circumstances the same might have been used, and that there is no right of appeal to the courts in this particular. Such a construction of the law makes the legislature the sole judge of the constitutionality of its own acts of this character.

There must be a right of review or control, to some extent, in the courts. Each citizen is entitled to the protection of all the branches of the government. A declaration by the legislature as to what the law shall be, is not necessarily a conclusion reached by the state. The legislature is not the state, although a very important or essential part of it. The power to protect the rights of the citizen from the wrongful effect of such legislation is peculiarly adapted to, and within the province of, the judicial branch of the government, and can be exercised in one of two ways. Either the scope of such legislation should be limited to those instances where injury results as a matter of fact, and resorting to a trial in court to prove that fact in each individual instance, or if this would render an enforcement of the law impracticable, and a few must suffer for the public good by being prevented from regulating their own personal conduct in some matters beneficial or not harmful to them, in order that another class may be prevented from like actions which to such persons would be harmful, then by recognizing a discretionary power in the legislature to prohibit such acts entirely, and at the

same time recognizing the duty of the courts to correct abuses thereof when the act prohibited should have no real relation or tendency to produce any of the results sought to be avoided.

To declare any private act or omission of the citizen to be a crime, which does not result in any injury to the person and could not possibly affect society, under any other possible view except the last one, would be an unwarranted infringement of individual rights, and therefore unconstitutional. Individual desires are too sacred to be ruthlessly violated where only acts are involved which purely appertain to the person, and which do not clearly result in an injury to society, unless, possibly, thus rendered necessary in order to prevent others from like actions which to them are injurious.

A great principle is involved in this character of legislation. Suppose the legislature had forbidden the use of opium in any manner. If the unqualified right to prohibit its use in one way exists, this carries with it the right to prohibit its use entirely. Substitute any other substance, whether commonly used as medicine, food or drink, and still such a statute must be upheld if the courts have no right of review. It is no answer to say that the legislature would do nothing unreasonable. No man knows as to this. The question is, has it the arbitrary power and right? Neither is it a sufficient answer to say that a man may appeal to a subsequent legislature for redress. That where such laws are wrongfully passed, the remedy must be sought in this way; and that until another legislature is convened, the citizen must tamely submit to and obey the restrictions and commands of every conceivable law relating to his personal conduct that through some possible legislative caprice or inadvertence might find its way upon the statute books, before the question could be again submitted to another legislature and its constitutionality again

be tried by it, as that is virtually what the question would be. If it tended to promote the public welfare in any of the ways specified it would be constitutional, and if it did not do so it would then be unconstitutional and void. And under such a view the legislature must decide this.

Because the right to a trial in the courts as to the fact of injury, resulting from the act in the particular case, would complicate matters and that it would be difficult to convict, affords no reason for taking away or denying the right, unless its effect would be to practically nullify the law, and not even in that case unless there is some other safeguard that must be held sufficient under the circumstances, such as limiting the action of the legislature to those matters wherein the injurious effects of the prohibited act would be clearly apparent in the great majority of cases. It is better that there should be difficulties in the way of conviction, rather than that the citizen should be arbitrarily and needlessly deprived of his right to regulate his own personal conduct in matters that purely appertain to himself, or that his constitutional guaranty of life, liberty and the pursuit of happiness should be violated. Laws that are enacted in response to a general public sentiment are easily capable of enforcement. And otherwise, in a representative form of government, where the will of the majority is supposed to control, laws which do not receive the popular support ought not to have been enacted, and, under such circumstances, no great harm results if they should practically fail in their execution, and become dead letters upon the statute books.

Whichever view is taken of the duty of the courts in the premises — whether to hold such laws must be limited to instances where injury results to the particular person or otherwise — the act in question should be held void. It is altogether too sweeping in its terms. I make no question but that the habit of smoking opium may be repulsive and degrading. That its effect would be to shatter the

nerves and destroy the intellect; and that it may tend to the increase of pauperism and crime.   But there is a vast difference between the commission of a single act, and a confirmed habit.   There is a distinction to be recognized between the use and abuse of any article or substance.

It is also a well-known fact that opium, in its different forms, is frequently administered as a medicine with beneficial results; and while it may not be customary to administer it by way of inhalation, yet the legislature should not arbitrarily prevent its use in such a manner.   If this act must be held valid it is hard to conceive of any legislative action affecting the personal conduct, or privileges of the individual citizen, that must not be upheld.   We have been cited to no law, which has been sustained, that goes to the extent that this one does.   It has no reference to the manufacture or sale of the substance.   It is not based upon any pernicious example that the commission of the act might be to others.   The prohibited act cannot affect the public in any way except through the primary personal injury to the individual, if it occasions him any injury. It looks like a new and extreme step under our government in the field of legislation, if it really was passed for any of the purposes upon which that character of legislation can be sustained, if at all.   An act somewhat similar to it was held void *in re* Ah Jow, 29 Fed. Rep. 181.

In former times laws were sometimes passed limiting individual conduct in ways that are now considered ridiculous.   Such as regarding the number of courses permissible at dinner.   The length of pikes that might be worn on the shoes, etc.   But these were founded on the pique or whims of an exacting and tyranical aristocracy, rather than on reason.  Or, as in the case of the Connecticut blue laws, upon views of propriety or religion that do not now obtain with anything like the former degree of strictness.

Judge Cooley, in his admirable work on Constitutional Limitations, star page 385, says: " In former times sump-

tuary laws were sometimes passed, and they were even deemed essential in republics to restrain the luxury so fatal to that species of government. But the ideas which suggested such laws are now exploded utterly, and no one would seriously attempt to justify them in the present age. The right of every man to do what he will with his own, not interfering with the reciprocal right of others, is accepted among the fundamentals of our law. The instances of attempt to interfere with it have not been numerous since the early colonial days.

"A notable instance of an attempt to substitute the legislative judgment for that of the proprietor, regarding the manner in which he should use and employ his property, may be mentioned. In the State of Kentucky, at an early day, an act was passed to compel the owners of wild lands to make certain improvements upon them within a specified time, and it declared them forfeited to the state in case the statute was not complied with. It would be difficult to frame, consistently with the general principles of free government, a plausible argument in support of such a statute. It was not an exercise of the right of eminent domain, for that appropriates property to some specific public use upon making compensation. It was not taxation, for that is simply an apportionment of the burden of supporting the government. It was not a police regulation, for that could not go beyond preventing an improper use of the land with reference to the due exercise of rights and enjoyment of legal privileges by others. It was purely and simply a law to forfeit a man's property if he failed to improve it according to a standard which the legislature had prescribed. To such a power, if possessed by the government, there could be no limit but the legislative discretion; and if defensible, on principle, then a law which should authorize the officer to enter a man's dwelling and seize and confiscate his furniture if it fell below, or his food if it exceeded, an established legal standard, would be equally

so. But in a free country such laws, when mentioned, are condemned instinctively." This statute referred to, was subsequently declared unconstitutional in *Gaines v. Buford*, 1 Dana, 484, as appears in the note in said work.

In *Mugler v. Kansas*, 123 U. S. 623 (8 Sup. Ct. Rep. 273), which was a case arising under the prohibitory liquor laws of that state, the court in its opinion discussed the question, somewhat, as to whether the state could prohibit a man from manufacturing liquor for his own personal use, and concluded it could do so if it affected the rights and interests of the community. As to where the power rested to decide as to this, the court said: "But by whom, or by what authority, is it to be determined whether the manufacture of particular articles of drink, either for general use or for the personal use of the maker, will injuriously affect the public? Power to determine such questions so as to bind all must exist somewhere, else society will be at the mercy of the few, who regarding only their own appetites or passions, may be willing to imperil the peace and security of the many, provided only they are permitted to do as they please. Under our system, that power is lodged with the legislative branch of the government. It belongs to that department to exert what are known as the *police powers of the state*, and to determine, primarily, what measures are appropriate or needful for the protection of the public morals, the public health, or the public safety.

"It does not at all follow that every statute enacted ostensibly for the promotion of these ends is to be accepted as a legitimate exertion of the police powers of the state. There are of necessity, limits beyond which legislation cannot rightfully go. While every possible presumption is to be indulged in, in favor of the validity of a statute, the courts must obey the constitution rather than the law-making department of government, and must, upon their own responsibility, determine whether, in any particular case, these limits have been passed." Here a discretionary

power in the legislature is distinctly recognized, and also a final revisory or restraining power in the courts to correct what may appear to be abuses. The court further said, quoting partly from *Marbury v. Madison*, 1 Cranch, 137 : " 'To what purpose are powers limited, and to what purpose is that limitation reduced to writing, if those limits may, at any time, be passed by those intended to be restrained. The distinction between a government with limited and unlimited powers is abolished if those limits do not confine the persons on whom they are imposed, and if acts prohibited and acts allowed are of equal obligation.'

"The courts are not bound by mere forms, nor are they to be misled by mere pretenses. They are at liberty — indeed, are under a solemn duty — to look at the substance of things, whenever they enter upon the inquiry whether the legislature has transcended the limits of its authority. If, therefore, a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is a palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the constitution."

From the best investigation I have been able to give this subject, I am forced to the conclusion that the judgment of the court below should have been reversed, and the defendant discharged.

Stiles, J., concurs in the dissenting opinion.