26 415
r26 452

## [No. 4066.]
### In re Application of Morgan for Writ of Habeas Corpus.

26  415
e36 490
37  320
37  321

1. Constitutional Law—Regulating Hours of Employment.

The act of the legislature, Session Laws, 1899, page 232, regulating the hours of employment in underground mines, and in smelting and ore reduction works, providing that the period of employment shall be eight hours per day and providing a penalty for violating the provisions of the act, is unconstitutional and void, (1) because it is an unwarrantable interference with and infringes the right of both employer and employee in making contracts relating to private business in which no possible injury to the public can result and is obnoxious to the provisions of the bill of rights, which guarantee to all persons their natural and inalienable rights of personal liberty, and of acquiring, possessing and protecting property; (2) because it unjustly and arbitrarily singles out a class of persons and imposes upon them restrictions from which others similarly situated are exempt, and is in contravention of that provision of the constitution prohibiting class legislation.

2. Same—Police Power.

An act of the legislature which prohibits an adult man from working or contracting to work more than eight hours per day in any private lawful business, in which no special privilege or license has been granted by the state, and the carrying on of which is attended by no injury to the general public, on the ground that working longer, may, or probably will, injure his own health, is not under our constitution a valid exercise of the police power of the state.

### Original Proceeding.

At a preliminary examination before a justice of the peace, upon a charge of contracting to labor in a smelter in excess of eight hours per day, the defendant was committed to jail in default of giving the required bail; and to secure his liberty has filed in this court his petition for a writ of *habeas corpus*. The prosecution was under section 2 of " An act regulating the hours of employment in underground mines, and in smelting and ore reduction works, and providing penalties for violations thereof," passed by the twelfth general

assembly, the material provisions of which are embraced in the first two sections:

"Sec. 1. The period of employment of working men in all underground mines or workings shall be eight (8) hours per day, except in cases of emergency, where life or property is in imminent danger.

"Sec. 2. The period of employment of working men in smelters, and in all other institutions for the reduction or refining of ores or metals, shall be eight (8) hours per day, except in cases of emergency, where life or property is in imminent danger."

Section 3 makes the violation of the foregoing provisions a misdemeanor, and provides the penalty therefor. Session Laws, 1899, page 360. The following sections of the constitution are referred to in the opinion:

"ARTICLE 2.

"Sec. 1. That all political power is vested in and derived from the people; that all government, of right, originates from the people, is founded upon their will only, and is instituted solely for the good of the whole."

"Sec. 3. That all persons have certain natural, essential and inalienable rights, among which may be reckoned the right of enjoying and defending their lives and liberties; that of acquiring, possessing and protecting property, and of seeking and obtaining their safety and happiness."

"Sec. 23. The enumeration in this constitution of certain rights shall not be construed to deny, impair or disparage others retained by the people."

"ARTICLE 5.

"Sec. 25. The general assembly shall not pass local or special laws in any of the following enumerated cases, that is to say * * * Subdivision 23. Granting to any corporation, association or individual any special or exclusive privilege, immunity or franchise whatever. Subdivision 24. In all other cases, where a general law can be made applicable, no special law shall be enacted."

Messrs. WOLCOTT & VAILE, Mr. JOHN M. WALDRON, Mr. C. W. WATERMAN, Mr. CHARLES H. TOLL and Mr. W. W. FIELD, for petitioner.

Mr. DAVID M. CAMPBELL, attorney general, Mr. CALVIN E. REED, Mr. DAN B. CAREY, Mr. BOOTH M. MALONE, Mr. DANIEL PRESCOTT, Mr. T. M. PATTERSON and Mr. JOHN H. MURPHY, for respondent.

CHIEF JUSTICE CAMPBELL delivered the opinion of the court.

The petitioner challenges the validity of the statute as inhibited by the foregoing clauses of the organic law. The position of the attorney general is that it was passed as a health regulation, and may be vindicated as coming within the range of the police powers of the state. Four years before it became an act, this court, to an inquiry of the house of representatives of the tenth general assembly as to the constitutionality of a bill reading, "Eight hours shall constitute a legal day's work for all classes of mechanics, working men and laborers employed in any mine, factory or smelter of any kind whatsoever in the state of Colorado," replied that it was "not competent for the legislature to single out the mining, manufacturing and smelting industries of the state and impose upon them restrictions with reference to the hours of their employees from which other employers of labor are exempt." And it was further said that the section "violates the right of parties to make their own contracts,—a right guaranteed by our bill of rights." *In re Eight Hour Bill*, 21 Colo. 29.

The twelfth general assembly must have been aware of this and another decision concerning the power of the legislature to pass what is called a coal screening bill,—the opinion being reported at page 27, same volume,—in which this species of legislation was condemned as hostile to the constitution. But wholly disregarding these decisions, binding alike on all

departments of government, it proceeded to enact the measure now before us. Though it affords no justification for such legislative action in defiance, and against the solemn decision, of this court, we presume the excuse that might be offered therefor is that, after these decisions were handed down, in a sister state, an act in the same language was passed and approved by its highest court, and, as is claimed, sanctioned by the supreme court of the United States. Following the rule of *stare decisis*, we might content ourselves with a mere affirmance of our previous announcements, made, as they were, upon full consideration; but in view of the importance of the questions involved we have thought it best fully to discuss the principles by which this act must be tested.

The question presented for our determination is, does the act under which the petitioner is being prosecuted violate any constitutional provision? In this resolution the provisions of our own constitution must govern. Decisions of other jurisdictions, defining the limits of legislation under their constitutions, are not always to be followed elsewhere, upon the supposition that the same limitations everywhere prevail. This is illustrated in the answer of the judges of the supreme judicial court of Massachusetts in response to an inquiry by the house of representatives as to the validity of a proposed bill. In the course of the opinion, after referring to the fact that legislation similar to that proposed had been held by the courts in some states unconstitutional on different grounds, and without expressing an opinion as to the correctness of those decisions, tested by the respective constitutions, the honorable judges said:

" The legislative power granted to the general court by the constitution of Massachusetts is perhaps more comprehensive than that found in the constitution of some of the other states." *In re H. B. No. 1230,* 163 Mass. 590; 40 N. E. Rep. 713.

A similar observation was made by the supreme court of Illinois in the *Ritchie* case, *infra.* It is peculiarly appropriate, we think, to our organic act. A comparison of many

other constitutions with ours shows that the latter probably contains more restrictions upon the power of the legislature than are to be found in any other instrument; and whether measured by the decisions of the courts of that state, or as the result of our own construction, we think it clear that the general court of Massachusetts has, in the field of legislation under review, much wider latitude, and is hampered by fewer restrictions than is our general assembly.

The extent and meaning of the act in question are not difficult of ascertainment, though it is not a model of statutory composition. That it operates as a limitation both upon the employer and the employee seems clear. It forbids a certain kind of employment. There can be no employment without the concurring acts of him who contracts for employment and of him who contracts to be employed. Both are within the inhibitions of the enactment; and, if it is valid, each is liable to the penalty for making the forbidden contract. The petitioner, therefore, as a laboring man, is prohibited from entering into a contract to work in a smelter more than eight hours in any one day.

If, in our constitution, there was, as there seems to be in that of Utah, a specific affirmative provision enjoining upon the general assembly the enactment of laws to protect the health of the classes of workingmen therein enumerated, it might be that acts reasonably appropriate to that end would not be obnoxious to that provision of our constitution forbidding class legislation; for it could hardly be said that a classification made by the constitution itself was arbitrary or unfair, or that it clashed with another provision of the same instrument inhibiting class legislation. The two provisions should be construed together, so as to harmonize, if that be possible, under sound canons of construction, and the general clause forbidding class legislation might be regarded as qualified by the special one which authorizes such legislation in respect to the enumerated classes.

Article 16 of our constitution is devoted to mining and irrigation, and section 2 directs that "the general assembly

shall provide by law for the proper ventilation of mines, the construction of escapement shafts, and such other appliances as may be necessary to protect the health and secure the safety of the workmen therein." These regulations manifestly embrace only such reasonably necessary mechanical appliances as will secure the end in view, and do not include other kinds of health regulations.

Whether this command, addressed to the legislature, to protect the health of these workmen by requiring the mines to be furnished with the appliances specified, does not restrict the lawmaking power to the things named, on the principle that when authority to do a particular thing is given and the mode of doing it is prescribed all other modes are excluded, might be a material inquiry where the validity of the act was challenged by a miner; but as that question relates to workmen in mines, and not in smelters, we prefer to put our decisions upon impregnable grounds that cover both cases.

Be that as it may, we have no constitutional provision which authorizes the legislature to single out workingmen in underground mines and smelters, and impose upon them restrictions as to the number of hours they shall work at these industries, from which workingmen in all other departments of industry are exempt. To this effect is our decision in *In re Eight Hour Bill, supra,* and we have heard no argument in the case at bar, nor have we been cited to any authority, that leads us to a different conclusion.

The act is equally obnoxious to the provisions of our bill of rights, set out in the statement, which guarantees to all persons their natural and inalienable right to personal liberty, and the right of acquiring, possessing and protecting property. Liberty means something more than mere freedom from physical restraint. It includes the privilege of choosing any lawful occupation for the exercise of one's physical and mental faculties which is not injurious to others. The right to acquire and possess property includes the right to contract for one's labor. The latter is essentially a property right. The arbitrary classification of rights into rights of

persons and rights of things, made by Blackstone and other jurists for purposes of convenience in treatment, has been the occasion for hostile criticism by those favoring socialistic or paternal legislation. Employing the *argumentum ad hominem*, they say that those decisions in which courts have carefully guarded rights of property put property above the man. A moment's calm reflection will show the falsity of this charge.

Property, as such, has no claim upon the protection of the law. When a property right is spoken of, the right of some person over, or concerning, the property is meant. All rights recognized by the law pertain to persons, natural or artificial. The absolute rights are commonly designated as personal rights. They are such as are annexed to the person, like life and reputation, while property rights are those unconnected with the person, but which, none the less, belong to some person. All rights, both those spoken of as personal and those denominated as property rights, belong to the individual citizen, and when it is said that property rights must not be infringed, what is meant is merely that the right of some person to, or concerning, property must not be interfered with. That this act infringes both the right to enjoy liberty and to acquire and possess property, seems too clear for argument. While not conceding that this limitation is not permissible, counsel for respondent, as we understand them, recognize the fact (but if they do not, the same is only too apparent) that these natural rights are violated by the provisions of the act. The limitation is claimed to be warranted on the ground that these and all other constitutional guarantees must yield to the paramount and sovereign right of the state to exercise its police power to protect the public health; and to this, the principal question in this proceeding, we now address ourselves.

The protection of the public health is mentioned neither in the body of the act, nor in its title, as is usually the case in similar acts of other states. When it is clearly perceived from the terms of an act that the thing prohibited necessarily

affects the public health, it may not be necessary expressly to declare therein what the object of the act is ; but where the result is doubtful, the object of the act ought, somewhere and somehow, to be stated, and, in accordance with some decisions, must be thus proclaimed, else the act will be held invalid on the ground that it is deceptive in not expressing its real object.    Possibly such declarations would not be conclusive that its real character is what it is expressed to be, any more than the absence of a declaration would be that such was not its true nature.    Where there is a mandatory requirement in the constitution (Const. Colo. art. 5, sec. 21) that no bill except the general appropriation bill shall contain more than one subject, which shall be clearly expressed in the title, the title of this act is at least questionable.    Certainly, unless "regulating the hours of employment" is synonymous with, or equivalent to, "protecting the public health," the title would seem to be dubiously stated.    But as counsel have not made this point, we pause only to mention, but not to decide it.

It is upon the hypothesis, however, that it is the duty of the judiciary to sustain every act of the legislative department, if it can be done on any conceivable rational constitutional ground, that, for the present purpose, we assume with counsel for respondent that the object of the legislature was the enactment of a health measure, and that, in effectuating the same, it has complied with the clause of the constitution just referred to.

Starting, then, with the premise, which is practically admitted to be true, that this act contravenes the constitutional provisions quoted in the statement, let us see if, notwithstanding this conflict, it can be justified as a valid exercise of the police power.    It is difficult to define, or with precision to describe, the police power.    It has rarely been attempted by the courts, and the attempt has never been attended with complete success.    Following the authorities, we may say that it extends to the protection of the public health.    It is upon the specific ground that limiting the time a working-

man may labor in a smelter to eight hours a day conduces to, and preserves, the health of the laborer himself, that this act is sought to be upheld. With sincere respect for the ability of the courts in whose opinion the remarks are found, but with a profound conviction of their erroneous conception of the nature and limits of the police power, we submit that much loose reasoning has been indulged in, and some decisions rendered that cannot be defended upon principle. As we understand it, the police power is the name given to that function of government by which is enforced the maxim *sic utere tuo, ut alienum non laedas*. In Cooley's Constitutional Limitations (6th ed.), 208, we read that this maxim "is that which lies at the foundation of the power." Prof. Tiedeman, in his work on the Limitations of Police Power, in § 1, says:

"The object of government is to impose that degree of restraint upon human actions, which is necessary to the uniform and reasonable conservation and enjoyment of private rights. * * * The conservation of private rights is attained by the imposition of a wholesome restraint upon their exercise, such a restraint as will prevent the infliction of injury upon others in the enjoyment of them."

He further quotes with approval the language of Judge Redfield in the case of *Thorpe v. Rutland, etc., R. R.*, 27 Vt. 140:

"This police power of the state extends to the protection of the lives, limbs, health, comfort and quiet of all persons, and the protection of all property within the state. According to the maxim, *sic utere tuo, ut alienum non laedas*, which being of universal application, it must of course be within the range of legislative action to define the mode and manner in which every one may so use his own as not to injure others."

And Prof. Tiedeman immediately follows this quotation with the statement that:

"Any law which goes beyond that principle, which undertakes to abolish rights, the exercise of which does not involve an infringement of the rights of others, or to limit the exercise of rights beyond what is necessary to provide for the

public welfare and the general security, cannot be included in the police power of the government."

It thus appears that, in proceeding under this power, the legislature must choose proper subjects for its exercise, and must observe constitutional limitations just as closely as when it enacts laws pertaining to the public revenue, or provides for the exercise of the power of eminent domain. In our form of government, unlimited power does not exist in any department (Prentice on Police Powers, 267 ; *Loan Assn. v. Topeka,* 20 Wall. 655) ; and whenever the constitutionality of an act of any department is challenged, the judicial department is the final arbiter.

Notwithstanding this general rule, we are here met with the argument, and the assertion is baldly made, that in the exercise of its police power, the legislature is subject to no restriction except its own unbridled discretion as to what subjects it may select for regulation, and the kind of regulation it may prescribe. We cannot assent to this doctrine. It may find apparent sanction in unguarded expressions of text writers, or in judicial opinions, but it is contrary to every well considered decision. It is for the legislature to determine the exigency, that is, the occasion, for the exercise of the power; but it is clearly within the jurisdiction of the courts to determine what are the subjects upon which the power is to be exercised, and the reasonableness of that exercise. Tiedeman's Limitations of Police Power, § 3 ; *People v. J. & M. P. R. Co.,* 9 Mich. 285 ; *Lake View v. Rose Hill Cemetery Co.,* 70 Ill. 191 ; 18 Am. & Eng. Ency. of Law, 746, *et seq. ; People v. Gillson,* 109 N. Y. 389.

In that great repository of constitutional learning (Cooley's Const. Lim.) Judge Cooley, at page 208 (6th ed.), well says:

" The maxims of Magna Charta and the common law are the interpreters of constitutional grants of power, and those acts which by those maxims the several departments of government are forbidden to do cannot be considered within any

grant or apportionment of power which the people in general terms have made to those departments."

This observation, as we take it, is as pertinent to the general police power vested in, though not expressly conferred upon, the legislature under written constitutions, as it is to some express power therein delegated. At page 711 of the same work is quoted with approval the following language of Judge Christiancy found in his able opinion in *People v. J. & M. P. R. Co.*, *supra*:

"Powers which can only be justified on this specific ground (that they are police regulations), and which would otherwise be clearly prohibited by the constitution, can be such only as are so clearly necessary to the safety, comfort and well-being of society, or so imperatively required by the public necessity, as to lead to the rational and satisfactory conclusion that the framers of the constitution could not, as men of ordinary prudence and foresight, have intended to prohibit their exercise in the particular case notwithstanding the language of the prohibition would otherwise include it."

The opinion in *Palmer v. Tingle*, 55 Ohio, 423; 45 N. E. Rep. 313, discusses the nature of the police power. Reserving opinion as to the correctness of the determination of the court in that case with reference to the law before it, which has been repudiated in *Jones v. Great Southern, etc., Hotel Co.*, 86 Fed. Rep. 370, its remarks in discussing one phase of the general subject meet with our approval. In reply to the argument of counsel, who claimed the most sweeping power of the legislature in restricting the right of contract, when the general good requires it, the court said:

"It may be restrained only in so far as it is necessary for the common welfare and the equal protection and benefit of the people. That such restraint of the right and liberty of contract is for the common public welfare and equal protection and benefit of the people, must appear, not only to the general assembly, by force of popular clamor, or the pressure of the lobby, but also to the courts; and it must be so clear, that a court of justice, in the calm deliberation of its judg-

ment, may be able to see that such restraint is for the common welfare and equal protection and benefit of the people."

To the same effect see *Spry Lumber Co. v. Sault Savings Bank, etc., Co.*, 77 Mich. 199.

In the light of these principles, every act of this character must be tested. While invoking, as a warrant for this act, that phase of the police power extending to the public health, its supporters do not claim that its real and primary object is to protect the public health, or the health of that portion of the community in the immediate vicinity, or affected by the operation, of smelters. If that purpose is present at all, it is only so inferentially, and the means employed to secure it are neither adequate nor appropriate. The smelting of ores is a continuous process, night and day, the year through. It is not claimed that the business is injurious to public health. It would be absurd to argue that, while the process itself is continuous, limiting the hours of those laboring in a smelter in any wise conduces to preserve the health of any portion of the public. That is to say, three shifts of laborers, working eight hours each, would affect the public health to the same extent, if at all, as would two shifts at twelve hours each. It is not contended that the business of smelting is unlawful; nor is it claimed that the act was passed to prevent employers from perpetrating fraud upon employees, or to protect the latter from trespasses. Indeed, the only object that can rationally be claimed for it is the preservation of the health of those working in the smelters.

Were the object of the act to protect the public health, and its provisions reasonably appropriate to that end, it might be sustained; for in such a case even the constitutional right of contract may be reasonably limited. But the act before us is not of that character. In selecting a subject for the exercise of the police power the legislature must keep within its true scope. The reason for the existence of the power rests upon the theory that one must so use his own as not to injure others, and so as not to interfere with, or injure, the public health, safety, morals or general welfare. How can

one be said injuriously to affect others, or interfere with these great objects, by doing an act which confessedly visits its consequences on himself alone? And how can an alleged law, that purports to be the result of an exercise of the police power, be such in reality, when it has for its only object not the protection of others or of the public health, safety, morals or general welfare, but the welfare of him whose act is prohibited, when, if committed, it will injure him who commits it, and him only? The maxim does not read: So use your own right or property as not to injure yourself or your own property.

Perceiving the inconsistency that must follow an attempt to vindicate a law on the principle that underlies the police power, counsel adroitly invoke the maxim, *salus populi suprema est lex.* So far as we can ascertain, no commentator and no judge has ever sought to borrow this wholesome maxim and use it as a prop to uphold a law whose object is to protect a man against himself. The welfare of the people is indeed the supreme law, but this maxim cannot be twisted to sustain a law violating private rights which contemplates the promotion of the welfare of less than the entire people. Our bill of rights expressly says that government is instituted solely for the good of the whole.

In this we must not be understood as limiting the legislature, where the facts justify apparent discrimination, in passing health laws affecting only certain classes. Indeed, laws having for their object the protection of small portions of a community have been upheld, as in *Fertilizing Co. v. Hyde Park,* 97 U. S. 659, where a nuisance, obnoxious probably only to part of a village, was abated; but what we mean to decide is that in a purely private, lawful business, in which no special privilege or license has been granted by the state, and the carrying on of which is attended by no injury to the general public, it is beyond the power of the legislature, under the guise of the police power, to prohibit an adult man who desires to work thereat from working

more than eight hours a day, on the ground that working longer may, or probably will, injure his own health.

*Ah Lim v. Territory*, 1 Wash. 156, held valid an act of the territory providing that any person who smoked or inhaled opium was guilty of a misdemeanor, notwithstanding the object, or, at least, one object, of the act was to protect the smoker or inhaler himself from the effect of his own act. This regulation was thought by three of the five judges to be warranted by a provision of the organic act of the territory (no question of conflict with a state constitution being in issue) extending, as they said, " the power of the territorial legislature to all rightful subjects of legislation, and when once we concede the rightfulness of the subject, the extent and character of the legislation on that subject cannot be called in question by the courts." Possibly some courts would uphold such legislation, if confined to appropriate cases, on the ground that smoking or inhaling opium was necessarily demoralizing to society, degrading to public morals, and injurious to the general welfare. But the position taken by the Washington tribunal that courts cannot inquire into the character of an act, or question legislation, finds no sanction in any well considered case or standard text book. In the dissenting opinion the true doctrine is recognized.

In some of the other cases are found such expressions (*dicta*, it is true) as that the state has such an interest in each citizen that it may protect him against the consequences of his own rashness: and upon the theory that the state is made up of the sum of all its parts, it may, for each individual, and for his supposed good, prescribe any regulations that are appropriate and suitable for the whole. In other words, this theory is based upon the proposition that each part making up the whole includes the whole itself in the same sense that the whole includes each part. This, in principle, is the same as the theory that would authorize the state to prescribe any regulations it saw fit for keeping a citizen out of its jails, hospitals or poorhouses, because it is a legitimate func-

tion of government to levy and collect taxes to build such institutions. The argument in support of such a theory is specious; and while in one sense (but to a limited extent only) true, yet, like all argument from analogy, it is dangerous, and should be carefully circumscribed. If the theory is correct, the state would be justified in prescribing the most minute details for the regulation of the personal conduct of individual citizens, as to things in no wise affecting the great public interests. Whenever a man fails in business, or loses a fortune by some great calamity, or droughts or floods destroy his crops, the legislature could levy a tax, or make an appropriation, and therefrom establish him in business, or make good the loss. The practical application of the theory would destroy the fundamental principles upon which our government is founded.

Let us make some further applications of this principle, and see to what such legislation would lead. It is, of course, no objection to this act to say that hereafter the legislature may pass another act that is invalid. But if the principle of the decision by which the present one is saved, in its logical extension will protect others that every rational mind will declare void, it is well to stop for reflection, for it is a question of power and not discretion we are now considering. The business of operating smelters and working underground mines is purely a private business. It is not affected with a public interest, or devoted to a public use.  Even here the general and better rule is that regulation of such businesses are confined to their public side, and do not descend to interference in contracts and strictly private dealing between employers and employees. Hence, smelting does not come within the operation of the principle of those decisions in which have been upheld reasonable regulations of a business affected by a public interest. If, to protect the health of workmen engaged in these two occupations, the legislature may limit them to eight hours' labor per day, it may hereafter, upon the ground that idleness, resulting from short hours of labor, leads to drunkenness and gambling;

and industry, promoted by longer hours, to happiness and health, enact that workmen must labor at these occupations fourteen or sixteen hours per day; and by extending the same principle to other occupations, it may say, to use an illustration employed in argument, that a man weighing one hundred and twenty pounds or less shall not work in a stone quarry, because only large and powerful men can safely work therein; that only men free from a tendency to tuberculosis shall work at indoor occupations, because those so afflicted need more pure air and sunshine than they can get if excluded from the open air; that only persons not needing the aid of eyeglasses shall become makers or repairers of watches, because labor, with such mechanical aids, upon delicate mechanisms tends to destroy vision; or that those suffering from sluggish livers shall not engage in sedentary occupations, because their health demands active, muscular effort. Then it is only one step further to provide by law the style and quality of garments the citizen may wear, the quantity and quality of food he may eat, and the beverage he may drink. And because one cannot support and properly educate his family for less than a certain amount of money, the legislature may declare that, to promote the general welfare, no employer shall contract to pay, or pay, an employee less than an arbitrary wage so fixed as to produce the required sum.

Such, and other, illustrations that readily suggest themselves are germane, and each and every supposed act could be sustained upon the same principle that would make the act before us valid. If counsel's contention be sound, that to promote the general welfare and protect the public health or safety, the legislature is above the constitution and brooks no restraint; if it is the sole judge, not merely of the exigency, but also of the subjects for the exercise of the police power and its reasonableness, then, indeed, all these, and almost all other conceivable regulations of private affairs are permissible. If we stop to consider the form of the government under which we live, and what pains the framers of our organic acts

took to protect the rights of the individual citizen, we would naturally expect to find that measures passed for the alleged protection of the citizen against the consequences of his own acts would clash with constitutional safeguards inserted therein to conserve the inalienable rights of men.

, This maxim, like many others, has been much abused; but restricting legislation to measures clearly within its scope is not abusing, but merely giving proper effect to it.

In this connection we notice, what has already been suggested, an argument pressed upon us in support of this species of legislation.   We are told that the law is, to a large extent, a progressive science ; that during our national existence many changes and reforms, both in procedure and in substantive law, have been made ; and that to conform to the complex conditions of modern society and to solve the many problems arising out of the industrial relations, many more such will likely take place, and the law will be forced to adapt itself to these new conditions, if society is to be kept together and government preserved.

We are not disposed to dispute the accuracy of these observations or the correctness of the prediction made, but we fail to perceive the force of the application to the statute in hand.   Such legislation does not denote an advance in the law of the domestic relations.   On the contrary, it is a distinct and emphatic return, a retrogression, to that period in English history when parliament busied itself in passing numerous acts interfering with the freedom of conscience in religious matters, and in prescribing minute regulations of the personal conduct of the individual, against which our ancestors rebelled, and which was one, among other causes, that prompted them to found here a government under which it would be impossible thus to interfere with the purely private affairs of the citizen.

Our conclusion as to the invalidity of this act is grounded upon principle.   Let it now be tested by the authorities. Except as to the penalty, the act is identical in terms with a law of Utah which, in three cases in the supreme court of

that state, has been held valid; and in two of the cases on writ of error from the supreme court of the United States the judgment of the state court has been affirmed.  *State v. Holden*, 14 Utah, 71; *State v. Holden*, 14 Utah, 96; *Short v. B. B. & C., M. Co.*, 57 Pac. Rep. (Utah) 720; *Holden v. Hardy*, 169 U. S. 366.

They are the only authorities directly in point that are cited as sanctioning our act, and the only additional ones which may fairly be considered, either in the reasoning of the opinions or in the principles involved, as tending to uphold it, are *Commonwealth v. Hamilton Mfg. Co.*, 120 Mass. 383, and *State v. Peel Splint Coal Co.*, 36 W. Va. 802.  In the Massachusetts case the act construed provided that, " No minor under the age of eighteen years, and no woman over that age, shall be employed in laboring by any person, firm or corporation in any manufacturing establishment in this commonwealth more than ten hours in any one day," etc.  This enactment, under some authorities, might be held valid, applying, as it does, only to women and minors, since "the former class, on account of sex and supposed physical infirmities, and the latter, because of their tender age, are under the guardianship of the state, and not standing on an equality with adult men, are subjects of restraining regulations.  But it is not clear whether the act was sustained on this ground, or that it was a valid police regulation.  Probably not the latter, for the court remarked that such legislation might be maintained either as a health or police regulation, if it were necessary to resort to those sources for power.  If the former, the case would not be apposite.  Whatever the basis for the decision may be, the reasoning of the court in support of it is not satisfactory, for in answer to the argument that the prohibition of the act violated the right of an adult woman to labor as many hours per day as she chooses, the court said :

" The obvious and conclusive reply to this is, that the law does not limit her right to labor as many hours per day or per week as she may desire ; it does not in terms forbid her laboring in any particular business or occupation, as many

hours per day or per week, as she may desire; it merely prohibits her being employed continuously in the same service more than a certain number of hours per day or week, which is so clearly within the power of the legislature, that it becomes unnecessary to inquire whether it is a matter of grievance of which this defendant has the right of complaint."

We may apparently digress to remark that if this construction is correct, and if the real object of the act be to protect the health of a certain class of working women by shortening the hours of labor, that object is frustrated, since, if the act permits one of the designated class, after working the eight hours, to engage in any other than the forbidden kind of labor for as many additional hours as she choose in any one day, practically there is no limit at all upon the length of time that she may work, provided she can get employment.

But the disposition made of the case evades the real question. To one who desires to devote her entire time and energies in laboring at one particular occupation in which the legislature seeks to restrict her, it is no answer to say that her right to make contracts for her labor is not curtailed because she may work as many additional hours as she pleases at some other occupation. The value of the right consists in freedom to labor in any lawful business she may select, for as many hours each day as she chooses.

This case is the only authority cited in some of the text books for legislation of this character; but we cannot follow it. Its doctrine, as applicable to adult men at least, is materially weakened, if not overthrown, by the subsequent decision in Commonwealth v. Perry, 155 Mass. 117, where an act providing that no employer shall impose a fine upon an employee engaged at weaving, or withhold his wages, in whole or in part, for imperfections that may arise during the process of weaving, was held to be in conflict with the constitution of that commonwealth, as interfering with the right of acquiring, possessing and protecting property; and in the latter case are cited with approval several authorities hereinafter to be discussed, which are squarely in conflict with the former.

In the constitution of Utah there is an entire article (16) devoted to the rights of labor. For our present purpose, sections 1, 6 and 7 only need be here reproduced. They are :

" Section 1. The rights of labor shall have just protection through the laws calculated to promote the industrial welfare of the state."

" Sec. 6. Eight hours shall constitute a day's work on all works or undertakings carried on or aided by the state, county or municipal governments ; and the legislature shall pass laws to provide for the health and safety of employees in factories, smelters and mines."

" Sec. 7. The legislature, by appropriate legislation, shall provide for the enforcement of the provisions of this article."

While disclaiming any expression of opinion as to whether the act in question might or might not, be upheld as an exercise of the police power which, though unexpressed in the constitution, resides in every sovereign state, the supreme court of Utah clearly grounded its decision upon the mandatory nature of the foregoing section 6. The imperative command thereof was thought to operate both upon the legislature and the courts ; upon the legislature as an express injunction requiring the enactment of legislation to protect the health of the classes enumerated, and upon the courts as an implied restriction, withdrawing from them an inquiry into such legislation as should be passed in obedience to that command, upon which investigation, in the absence of the constitutional limitation, and with respect to such legislation as comes within the range of the general police power, the court might enter to ascertain if it accords with the constitution. This extract from the opinion of Zane, C. J., bears out our statement:

" The provision of the state constitution quoted makes it the duty of the legislature to ' pass laws to provide for the health and safety of employees in factories, smelters and mines.' And we are not authorized to hold that the law in question is not calculated and adapted in any degree to promote the health and safety of persons working in mines and

smelters.   Were we to do so, and declare it void, we would usurp the powers intrusted by the constitution to the law-making power."

And the remark of Mr. Justice Brown, in *Holden v. Hardy*, *supra*, further corroborates it, when he said :

"The supreme court of Utah was of opinion that if authority in the legislature were needed for the enactment of the statute in question, it was found in that part of article 16 of the constitution of the state, which declared that 'the legislature shall pass laws to provide for the health and safety of employees in factories, smelters and mines.' "

As the question is not necessarily before us, perhaps we properly withhold opinion upon it ; but we are not prepared to say, with counsel for petitioner, that this provision of the Utah constitution is so far different from ours that the former instrument will, and the latter will not, permit of such legislation.   Rather we may say that we are impressed with the able argument of counsel appearing *amici curiæ* in behalf of the law, wherein they maintain with strong reasoning, that the presence in the Utah constitution of article 16, on which the Utah court founded its decision, adds nothing to the power which the legislature would have without it ; unless it be, as we are disposed to concede, that its presence removes the objection that otherwise might be made to an act on the ground that it is class legislation.   However this may be, upon the claim that the decision of the state court in the Utah cases is a precedent for us, it is sufficient now to say that no effort was there made, as there is here, to vindicate the law as a valid exercise or the general unwritten police power ; and for this reason the cases cannot be treated as authority.   And since we are entitled to presume that the court there chooses the strongest, if not the only ground on which to rest its determination, but little, if any, weight is to be given to the claim that the reasoning of the opinion supports respondent's contention that our act is in harmony with our own constitution.

It is chiefly on account of the authoritative character of

decisions of the supreme court of the United States that we are asked to uphold this act.  It goes without saying that if a federal question were involved in the case at bar, and had been passed upon by that tribunal, our duty in the premises would be clear.  But the petitioner does not invoke the protection of any provision of the national constitution ; he maintains that his sacred rights of liberty and freedom of contract embraced in his right of property, and his exemption from arbitrary and unjust discriminations, all of which are guaranteed to him in the sections of our constitution above quoted, are violated by this act.  It is a mistaken notion that the 14th article of amendment to the national constitution created any civil rights, or entitled citizens of states to transfer from the states to the federal government their security and protection.  In a long series of decisions, beginning with the *Slaughter House Cases*, 16 Wall. 36, and among other great cases in *Patterson v. Kentucky*, 97 U. S. 501, *Butchers' Union Co. v. Crescent Co.*, 111 U. S. 746, 759, *Barbier v. Connelly*, 113 U. S. 27, *Yick Wo v. Hopkins*, 118 U. S. 356, *Powell v. Penna.*, 127 U. S. 678, 683, and *Allegeyer v. State of La.*, 17 Sup. Ct. Rep. 427, the supreme court of the United States has held, as well expressed by Mr. Miller, J., in the *Slaughter House Cases:*

" The constitutional provision there alluded to did not create those rights, which it called privileges and immunities of citizens of the states.  It threw around them in that clause no security for the citizen of the state in which they were claimed or exercised.  Nor did it profess to control the power of the state governments over the rights of its own citizens.

"Its sole purpose was to declare to the several states, that whatever those rights, as you grant and establish them to your own citizens, or as you limit or qualify, or impose restrictions on their exercise, the same, neither more nor less, shall be the measure of the rights of citizens of other states within your jurisdiction."

And by Field, J., in the *Barbier* case :

" Neither the amendment — broad and comprehensive as it

is — nor any other amendment, was designed to interfere with the power of the state, sometimes termed its police power, to prescribe regulations to promote the health, peace, morals, education, and good order of the people, and to legislate so as to increase the industries of the state, develop its resources, and add to its wealth and prosperity."

See also, 118 U. S. 365.

And so long as any state observes the requirements of the fourteenth amendment, and, in its legislation, gives to citizens of other states the same privileges and immunities that are enjoyed by its own citizens, and provides that no person shall be deprived of life, liberty or property without due process of law, and affords to all persons within its jurisdiction the equal protection of its laws, the federal courts cannot interfere therewith, even though the policy of the state be unwise, its laws arbitrary and oppressive and flagrantly in violation of the state constitution. And so it might well be that a law is valid so far as a clause of the federal constitution is concerned, and yet be expressly inhibited by the constitution of a state. It does not necessarily follow, therefore, that because an act has met the approval of the supreme court of the United States as not infringing any provision of the federal constitution, it is, for that reason, free from a prohibition contained in a state constitution. This distinction is not always observed, and some confusion exists on account of the loose talk about it. It should be said that counsel for respondent recognize it; nevertheless they would have us sustain this law on the authority of a decision which, when rightly considered under the facts of this case, is not an authority at all. In many of its own decisions, the supreme court of the United States has clearly indicated the extent and scope of its jurisdiction in cases like that before it in the *Holden* case. In the *Barbier* case, *supra*, Mr. Justice Field, speaking for the court, said :

" In this case we can only consider whether the fourth section of the ordinance of the city and county of San Francisco is in conflict with the constitution or laws of the United

States. We cannot pass upon the conformity of that section with the requirements of the constitution of the state. Our jurisdiction is confined to a consideration of the federal question involved."

And in *Yick Wo v. Hopkins, supra*, Mr. Justice Matthews, speaking for the court, says :

" The question whether his imprisonment is illegal, under the constitution and laws of the state, is not open to us. And although that question might have been considered in the circuit court in the application made to it, and by this court on appeal from its order, yet judicial propriety is best consulted by accepting the judgment of the state court upon the points involved in that inquiry."

In *People v. Budd*, 117 N. Y. 1, we find both in the majority and dissenting opinions admirable statements of what consideration should be given by a state court to a decision of the supreme court of the United States on a question of constitutional law, where the point relates to the validity of a state statute claimed to be void because it deprives a citizen of life, liberty and property without due process of law ; and the decision sustains the validity of the law. Mr. Justice Andrews, speaking for the majority, thus states the rule :

" Since the fourteenth amendment, the question whether a state statute infringes the constitutional guaranty protecting life, liberty and property where it arises in a state court, involves the consideration of both the federal and state constitutions, although the ground of construction and decision is identical under either instrument. But whether the decisions of the state court presents a federal question reviewable on appeal to the supreme court of the United States, depends on the nature of the decision of the state court ; that is to say whether it affirmed the validity of the statute, or held it to be unconstitutional and void. If the state court decides that the statute does violate the constitutional guaranty, its decision is now, as before the fourteenth amendment, final and conclusive, and no appeal can be taken to the federal court, as in

that case no right under the constitution and laws of the United States has been denied. If, on the other hand, the state court sustains the statute and denies the right asserted, the federal jurisdiction attaches, and an appeal may be taken to the United States supreme court. It cannot be maintained, we think, that a decision of the federal court sustaining a state statute is *res adjudicata* and binding upon a state court, when the same question subsequently arises there under a similar statute. It would still be the duty of the state court to examine the question and decide it according to its interpretation of the constitutional guaranty."

Peckham, Justice, tersely, and to the same effect, on page 35, says:

"In construing a clause in our state constitution similar to one in the federal instrument, should we follow the interpretation of such clause as given by the federal court, which interpretation compels us to deny to these defendants the relief they ask for, although otherwise we are satisfied that they are justly entitled to that relief.

"If any right, privilege or immunity claimed under the federal constitution or laws be denied by this court, its decision is reviewable in the supreme court, and in such cases it is our duty to follow in the footsteps of that court and to be guided and controlled by its decisions. But in this case the right is claimed under our state constitution, and in matters pertaining to its proper construction our decision is final, excepting that if, as construed by us, the constitution or our laws deny the existence of some right or privilege claimed by a party by virtue of the federal constitution or laws, our decision is reviewable by the federal court not for the purpose of reviewing our construction of our own constitution or laws, but to see whether, under the constitution or laws as construed by us, any right or privilege existing by virtue of the federal constitution or laws has been violated or denied, and if so, to give effect, notwithstanding the state law or constitution. But where we deny no right or privilege claimed,

and, on the contrary, assert and protect it, there is no review by the federal court possible."

In *City of Indianapolis v. Navin*, 151 Ind. 139; 51 N. E. Rep. 80, the same rule is laid down, and numerous authorities are cited.

We have made these extracts from the authorities chiefly for the reason that they furnish a complete answer to the contention of respondent's counsel that the decision 'of the supreme court of the United States in the *Holden* cases is, in the circumstances here present, a binding authority, or any authority, upon this court. In all such questions, when it is once determined that no federal question is involved, that is the end of the inquiry by the federal court.

For the sake of brevity we desire in this connection (though the reference might be equally pertinent elsewhere) to notice what Mr. Justice Brown, who wrote the opinion of the majority, said of these decisions of the various state courts declaring unconstitutional eight-hour statutes :

" We have no disposition to criticise the many authorities which hold that state statutes restricting the hours of labor are unconstitutional. Indeed, we are not called upon to express an opinion upon this subject. It is sufficient to say of them, that they have no application to cases where the legislature had adjudged that a limitation is necessary for the preservation of the health of employees, and there are reasonable grounds for believing that such determination is supported by the facts."

The last sentence, removed from its proper setting, in its literal signification might seem to support respondent's contention that in exercising police power the legislature may override all constitutional limitations. If it be conceded, as it is not, that in the pending cause it was competent for that tribunal to make an announcement as to the power of the legislature in this connection that would bind the state courts, we think it clear that none such as is claimed here was made ; for when this sentence is read, as it should be, with what immediately precedes and follows, it is not sus-

ceptible of the interpretation put upon it. What follows is a declaration that, if the legislature has exercised a reasonable discretion, its act will be enforced, but if its action is a mere excuse for an unjust discrimination or the oppression of a particular class, it is a nullity. What precedes indicates, in the view of the court, that no criticism could be made upon the decisions of these state courts. These considerations, coupled with the closing words of the opinion, in which it is said that " the act in question was a valid exercise of the police power of the state," are persuasive that the learned justice intended his language to have only the scope to which language in an opinion must always be restricted, viz., the facts of the particular case, and that, therefore, this language, which would seem to be general in its application, was intended to be restricted to a case in which there was express constitutional authority as in Utah, for the enactment of legislation like that then, and now, challenged. But if we should be wrong in this construction, we must still for ourselves determine whether acts of our own legislature are, or are not, in contravention of our own constitution.

If the language used by that august tribunal in *Holden* v. *Hardy* is to be understood as limiting or defining how far a state legislature may go in the exercise of the police power without transcending any of the limits prescribed by the federal constitution, we agree with counsel for petitioner that it was needful to the ascertainment of the question before the court. But if it is not to be thus restricted, and if it was employed with the view to determining what are the true limits of the police power of a state under its provisions of the constitution of that state, the remarks in that connection are wholly *obiter* and not authority in that court itself, much less in any other jurisdiction. *Wadsworth v. U. P. Railway Co.*, 18 Colo. 600, 610 ; *Carroll v. Carroll's Lessee*, 16 How. 275, 287 ; 2 Black on Judgments, § 611.

In other words, as to whether a given act of a state legislature does or does not violate the federal constitution, the decision of the supreme court of the United States is supreme,

to which all other tribunals must yield obedience. On the other hand, upon the question as to whether or not a state law is valid or invalid under a state constitution, the decision of the supreme court of that state is supreme and binding upon the federal as well as the state courts, with well recognized exceptions, not applicable here, as illustrated in *Burgess v. Seligman*, 107 U. S. 20, 33.

In the light of these authorities it is clear, first, that the decision of the supreme court of Utah in construing the Utah statute is not an authority here, for the reason that the decision there was based entirely upon the mandatory nature of a provision of the Utah constitution which is not present in our organic act ; second, in affirming the judgment of the Utah court, the decision of the supreme court of the United States in the *Holden* cases is not a precedent for this court in construing our act for the reason that the sole question before the federal court was whether or not the Utah act violates the federal constitution. If, however, it could be maintained that this affirmance was, in effect, a determination that the Utah law was in harmony with the Utah constitution, the decision of the federal court would not be an authority here, because we have no such constitutional provision.

In *State v. Peel Splint Coal Co.*, 36 W. Va. 802, the court construed two acts, one prohibiting any corporation or person engaged in any business from paying its employees wages in anything but lawful money, the other providing that persons operating coal mines should weigh and measure coal at the place where mined, before the same is screened, the former being generally known as the scrip act, the latter as the coal screening act. Both were held constitutional.

It appears from the majority opinion that the decision as stated by the court was based upon two propositions : first, that defendant was a corporation which, under the laws of West Virginia, enjoyed unusual and extraordinary privileges, which enabled it to surround itself with a vast retinue of laborers who needed to be protected against all fraudulent or suspicious devices in the weighing of coal or payment of

labor; second, that the defendant, as a licensee was pursuing a vocation which the state had taken under its general supervision for the purpose of securing the safety of employees by ventilation, inspection and governmental report; and the defendant therefore must submit to such regulations as the sovereign thinks conducive to the public health, morals or public security. Two of the four judges dissented, and in vigorous opinions, fortified by cogent reasoning, held both acts to be unconstitutional. Considering the grounds upon which the decision was based, it is so manifestly not against our conclusion, under the facts of this case, that we need not stop to analyze the opinion.

We now proceed with cases squarely condemning such enactments. In *Lowe v. Rees Printing Co.*, 41 Neb. 127, an act providing that for all classes of mechanics, servants and laborers, except those engaged in farm or domestic labor, a day's work shall not exceed eight hours, was held unconstitutional; first, because the discrimination against farm and domestic labors is a special legislation; and second, because, by the act in question, the constitutional right of parties to contract with reference to compensation for services is denied.

In *Millett v. People*, 117 Ill. 294, an act providing for the weighing of coal at the mines, and requiring owners of mines to furnish and place upon the railway track adjacent thereto a track scale of the standard measure, was held to be unconstitutional both upon the ground that it was class legislation, and that it prohibited persons *sui juris* from making their own contracts. The opinion of Mr. Justice Scholfield is a very able and instructive one.

In *Frorer v. People*, 141 Ill. 171, an act directed against the truck system, which sought to prohibit persons engaged in the mining or manufacturing business from keeping a truck store was held to be unconstitutional on the ground that it was class legislation; and in discussing the limitations upon the police power, the following is pertinent:

" And it can hardly be admissible that the legislative determination that the facts are such as to warrant this dis-

crimination is conclusive—for that would make the general assembly omnipotent—since, if that were so, there could be nothing but its own discretion to control its action in regard to every liberty enjoyed by the citizen." See also *Ramsey v. The People*, 142 Ill. 380, *Braceville Coal Co. v. The People*, 147 Ill. 66, and *Harding et al. v. People*, 160 Ill. 459; 43 N. E. Rep. 624.

In *Ritchie v. The People*, 155 Ill. 98, is an exhaustive discussion of the scope and limitations of this power. The act there construed provided that no female shall be employed in any factory or workshop more than eight hours in any one day, or forty-eight hours in any one week. In a lucid opinion by Mr. Justice Magruder this measure was held void as violating those clauses of the Illinois constitution against class legislation, and prohibiting the enactment of laws which deprive a person of life, liberty or property without due process of law. The reasoning of the opinion goes beyond anything we have said respecting these limitations. Though many others equally pertinent might be made, we take the liberty of making therefrom the following extracts :

" The legislature has no right to deprive one class of persons of privileges allowed to other persons under like conditions. The man who is forbidden to acquire and enjoy property in the same manner in which the rest of the community is permitted to acquire and enjoy it, is deprived of liberty in particulars of primary importance to his pursuit of happiness. If one man is denied the right to contract as he has hitherto done under the law, and as others are still allowed to do by the law, he is deprived of both liberty and property to the extent to which he is thus deprived of such right."

" But the police power of the state can only be permitted to limit or abridge such a fundamental right as the right to make contracts, when the exercise of such power is necessary to promote the health, comfort, welfare or safety of society or the public ; and it is questionable whether it can be exercised to prevent injury to the individual engaged in a particular calling."

In this connection may be cited a leading case in the court of appeals of New York, *In re Jacobs*, 98 N. Y. 98, in which was nullified a pretended health law that sought to prohibit the manufacture of cigars and preparations of tobacco in any form in tenement houses, in certain cases.    Mr. Justice Earle, in the course of the opinion, says :

" To justify this law it would not be sufficient that the use of tobacco may be injurious to some persons, or that its manipulation may be injurious to those who are engaged in its preparation and manufacture ; but it would have to be injurious to the public health."

Mr. Tiedeman, at section 86 of his work, says :

"In so far as the employment of a certain class in a particular occupation may threaten or inflict damage upon the public or third persons, there can be no doubt as to the constitutionality of any statute which prohibits their prosecution of that trade.    But it is questionable, except in the case of minors, whether the prohibition can rest upon the claim that the employment will prove hurtful to them.    Minors are under the guardianship of the state, and their actions can be controlled so that they may not injure themselves.    But when they have arrived at majority they pass out of the state of tutelage, and stand before the law free from all restraint, except that which may be necessary to prevent the infliction by them of injury upon others.    It may be, and probably is, permissible for the state to prohibit pregnant women from engaging in certain employments, which would be likely to prove injurious to the unborn child, but there can be no more justification for the prohibition of the prosecution of certain callings by women, because the employment will prove hurtful to themselves, than it would be for the state to prohibit men from working in the manufacture of white lead, because they are apt to contract lead poisoning, or to prohibit occupation in certain parts of iron smelting works, because the lives of the men so engaged are materially shortened."

And at section 178 :

"Laws, therefore, which are designed to regulate the terms

of hiring in strictly private employments, are unconstitutional, because they operate as an interference with one's natural liberty, in a case in which there is no trespass upon private right, and no threatening injury to the public. And this conclusion not only applies to laws regulating the rate of wages of private workmen, but also any other law, whose object is to regulate any of the terms of hiring, such as the number of hours of labor per day, which the employer may demand. There can be no constitutional interference by the state in the private relation of master and servant except for the purpose of preventing frauds and trespasses."

Judge Cooley, in his standard work on Constitutional Limitations (5th ed.), at page 486, says:

"If the legislature should undertake to provide that persons following some specified lawful trade or employment should not have capacity to make contracts, or to receive conveyances, or to build such houses as others were allowed to erect, or in any other way to make such use of their property as was permissible to others, it can scarcely be doubted that the act would transcend the due bounds of legislative power, even though no express constitutional provision could be pointed out with which it would come in conflict. To forbid to an individual or a class the right to the acquisition or enjoyment of property in such manner as should be permitted to the community at large, would be to deprive them of *liberty* in particulars of primary importance to their "pursuit of happiness;" and those who should claim a right to do so ought to be able to show a specific authority therefor, instead of calling upon others to show how and where the authority is negatived."

And at page 745:

"The general rule undoubtedly is, that any person is at liberty to pursue any lawful calling, and to do so in his own way, not encroaching upon the rights of others. This general right cannot be taken away. It is not competent, therefore, to forbid any person or class of persons, whether citizens

or resident aliens, offering their services in lawful business, or to subject others to penalties for employing them."

In his work on Torts, the same learned author, at page 326, remarks:

"Every person *sui juris* has a right to make use of his labor in any lawful employment on his own behalf, or to hire it out in the service of others. This is one of the first and highest of civil rights."

And at page 337:

"Every man controls his own property as he pleases, puts it to such use as he pleases, improves it or not, as he may choose, subject only to the obligation to perform, in respect to it, the duties he owes to the state and to his fellows. The state cannot substitute its judgment for his as to the use he should make of it for his own advantage."

In his work on Constitutional Law, at page 312, Mr. Black, in speaking of laws limiting the hours of labor, after stating that they might be held valid as to women and children, and as to occupations affected with a public interest, thus proceeds:

"But where none of these circumstances apply, it is very doubtful whether such laws do not unwarrantably interfere with the right of contract."

*Leep v. Railway Co.*, 58 Ark. 407, contains a valuable discussion of this subject, which is in line with our own decision; and in the course of the opinion it is said that *Peel Splint Coal Co.*, *supra*, is against the weight of authority. At page 421 of the opinion, it is said:

"We think it is obvious that the right to contract cannot be limited by arbitrary legislation which rests on no reason upon which it can be defended; for, if it could, the right would cease to exist, and become a license revocable at the will of the legislature, and the government would become a despotism in theory, if not in fact. Such a power cannot exist, for, if it could, it would be subversive of the right to enjoy and defend liberty, to acquire and possess property, and to pursue happiness, declared to be inalienable by the constitution of this state."

" When the subject of contract is purely and exclusively private, unaffected by any public interest or duty to person, to society, or government, and the parties are capable of contracting, there is no condition existing upon which the legislature can interfere for the purpose of prohibiting the contract or controlling the terms thereof."

*State v. Loomis*, 115 Mo. 307, in discussing a scrip law, held that it was violative of the constitutional guaranty of due process of law, and void. *Godcharles v. Wigeman*, 113 Pa. St. 431, in passing upon the same sort of an act, held it unconstitutional as infringing the right of persons *sui juris* to make their own contracts. The supreme court of West Virginia, in *State v. Goodwill*, 33 W. Va. 179, held a scrip law unconstitutional on the ground that it was class legislation. In *People v. Budd, supra,* while the court held constitutional an act regulating elevator charges, on the ground that elevators were affected with a public interest and their owners had received special benefits from the state canal, yet the act itself was distinguished from one regulating a strictly private business. In respect thereto the court said:

" That no general power resides in the legislature to regulate private business, prescribe the conditions under which it shall be conducted, fix the price of commodities or services, or interfere with freedom of contract, we cannot doubt. The merchant and manufacturer, the artisan and laborer, under our system of government, are left to pursue and provide for their own interests in their own way, untrammeled by burdensome and restrictive regulations which, however common in rude and irregular times, are inconsistent with constitutional liberty."

In the dissenting opinion of Peckham, Justice, now a member of the supreme court of the United States, is one of the most masterly discussions of the police power to be found in the books; and while it is a matter of regret that, in dissenting from the decision of the majority of the court in *Holden v. Hardy*, in which he was joined by Mr. Justice Brewer, he did not state anew the grounds thereof, yet a careful reading

of his dissenting opinion in the case to which we now refer discloses his objections to the doctrine announced in the *Holden* case; and prior decisions of Mr. Justice Brewer upon the same subject attest his reasons for such dissent.

The late case of *People v. Warden, etc.*, 157 N. Y. Ct. App. 116; 51 N. E. Rep. 1006, holding invalid an act prohibiting all persons except the agents of a transportation company from engaging in the passenger ticket brokerage business, is in line with the current of authority on the limitations of the police power.

*State v. Julow*, 129 Mo. 163; 31 S. W. Rep. 781, condemns as void a law making it unlawful for an employer to prohibit an employee from joining, or to require an employee to withdraw from a trade or labor union, or other lawful organization, upon the ground that it is special legislation, and that it deprives the employee of property without due process of law. The following excerpt from the opinion places far greater restrictions upon the legislature in the exercise of the police power than it is necessary for us to do in the case at bar. After citing with approval the authorities which we have considered in this opinion, the court by Mr. Justice Sherwood, says:

" Nor can the statute escape censure by assuming the label of a ' police regulation.' It has none of the elements or attributes which pertain to such a regulation, for it does not, in terms or by implication, promote, or tend to promote, the public health, welfare, comfort or safety; and if it did, the state would not be allowed, under the guise and pretense of police regulation, to encroach or trample upon any of the just rights of the citizen, which the constitution intended to secure against diminution or abridgment. *In re Jacobs*, 98 N. Y. 98, and cases cited."

*Ex parte Kuback*, 85 Cal. 347, 9 Lawyers' Rep. Ann. 482, was a case in which was construed a municipal ordinance making it a misdemeanor for any person, when having labor performed for the purpose of carrying out a contract with the city, to demand, receive or contract for more than eight

hours' labor in any one day from any person; and the same was held void as an infringement of the right of such persons to make and enforce their contracts; and could not be upheld as a sanitary or police regulation, as it might be if the employment was unfit for certain persons, as, for example, females or infants.

This summary review of the leading authorities shows clearly to our minds that the great weight of authority, as well as reason, supports the conclusion which we have reached. The result of our deliberation, therefore, is that this act is an unwarrantable interference with, and infringes, the right of both the employer and employee in making contracts relating to a purely private business, in which no possible injury to the public can result; that it unjustly and arbitrarily singles out a class of persons and imposes upon them restrictions from which others similarly situated and substantially in the same condition, are exempt; and that it is not, under our constitution, a valid exercise of the police power of this state either in the subject selected or in the reasonableness of the regulation.

We cannot do better, in conclusion, than to quote from the opinion in the case of *Colon v. Lisk*, 153 N. Y. 188, construing an act authorizing summary destruction, without a jury trial, of boats used by one person in interfering with oyster beds, etc., belonging to another, for, in one respect, it so fitly characterizes the act before us:

" It is to be observed that the statute does not relate to the health, morals, safety or welfare of the public, but only to the private interests of a particular class of individuals. Nor can it be fairly said that the means provided for the protection of those interests are reasonably necessary to accomplish that purpose. But, on the contrary, they are plainly oppressive and amount to an unauthorized confiscation of private property for the mere protection of private rights. It is in no manner intended by this statute to protect any public interest, or defend any public right. Nor is it calculated to accomplish that

end, but, under the guise of a pretended police regulation, it arbitrarily invades personal rights and private property. * * *

" It is manifest that this extraordinary and extreme statute is not necessary and was not intended for the protection of the public. Its sole purpose was to regulate private interests and enforce private rights. In no sense can it be regarded as a police law, and, consequently, is not within the police power. In this statute we have another example of class legislation where the legislature has attempted to improperly interfere with the private rights of the citizen. This species of legislation has been so often condemned by this and other courts as to render any further discussion of its impropriety and invalidity wholly unnecessary."

The petition, therefore, should be, and the same is hereby, granted, and the petitioner should be, and hereby is, discharged from custody.